SIEGEL OIL COMPANY,
Plaintiff–Appellant,

v.

Bill RICHARDSON, Secretary of Energy and Office of Hearings and Appeals, Defendants–Appellees,

No. 99–1419.

United States Court of Appeals,
Federal Circuit.

April 11, 2000

Karen M. Lockwood, Collier, Shannon, Rill & Scott, PLLC, of Washington, DC, argued for plaintiff-appellant. With her on the brief were Lauren R. Howard, and Christopher J. DelliCarpini.

Don W. Crockett, Attorney, Office of General Counsel, United States Department of Energy, of Washington, DC, argued for defendants-appellees. Of counsel were David M. Cohen, Director; and Mark A. Melnick, Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC.

Before MAYER, Chief Judge, MICHEL, and GAJARSA, Circuit Judges.

MICHEL, Circuit Judge.

Appellant Siegel Oil Co. ("Siegel") appeals a decision of the United States District Court for the District of Columbia granting summary judgment in favor of the United States Department of Energy ("DOE"). *See Siegel Oil Co. v. O'Leary,* Slip op. 94–1498 (D.D.C. Mar. 3, 1999). This case concerns a claim filed by Siegel under a special refund procedure administered by the DOE Office of Hearings and Appeals ("OHA"). The appeal challenges OHA's denial of Siegel's claim for restitution pursuant to the Petroleum Overcharge Distribution and Restitution Act of 1986 ("PODRA"). Pub.L. No. 99–509, tit. 111 § 3002, 100 Stat. 1881, Oct. 21, 1986, (codified at 15 U.S.C. §§ 4501–07 (1994)). The OHA found that, with the exception of $5,000, Siegel had not demonstrated entitlement to recover restitution out of a special fund set up to compensate apparent victims of regulatory violations that may have been committed by Gulf Oil Company ("Gulf"). Siegel contested OHA's ruling in the U.S. District Court for the District of Columbia. The district court upheld the OHA determination on the ground that it was supported by substantial evidence and had a rational basis. Siegel asks this court to reverse the district court and require OHA to pay Siegel the entire half million dollars it requested. We agree with the district court that OHA's determination was supported by substantial evidence and had a rational basis and that no material issues of fact were genuinely disputed. We therefore affirm the summary judgment upholding OHA's rejection of Siegel's PODRA claims.

## BACKGROUND

The Mandatory Petroleum Price and Allocation regulations, promulgated on January 15, 1974, established price ceilings for crude oil and other petroleum products and mandated a continuing supply at previous levels between historic suppliers and purchasers, pursuant to section 5(a)(1) of the Emergency Petroleum Allocation Act

of 1973 ("EPAA"), Pub.L. No. 93–159, 87 Stat. 628; 15 U.S.C. §§ 751–760h (1982), which incorporated section 211 of the Economic Stabilization Act of 1970 ("ESA"), Pub.L. No. 91–379, 84 Stat. 799; 12 U.S.C. § 1904 note (1976). The price regulations required gasoline suppliers to designate a "class of purchaser" category for each of their customers that reflected "customary price differentials" among their customers and to charge all customers in the same category the same price. *See* 10 C.F.R. § 212.92 (1975). The allocation regulations required that a supplier offer to any purchaser during the control period (1974–81) the same volume of gasoline that it sold to that purchaser during a designated base period. The base period for any given month during the control period was the corresponding month of 1972. *See* 10 C.F.R. § 211.02 (1978). An exception to the supply requirement of the allocation regulations provided that a supplier could designate a "substitute supplier" to supply any purchaser in "accordance with normal business practices." 10 C.F.R. § 211.25 (1975). The DOE, upon its creation, became responsible for enforcing the price and allocation control regulations.

On June 14, 1986, DOE and Gulf entered into a Consent Order settling DOE's claims that Gulf had violated the regulations during the Consent Order period from January 1, 1973 through January 27, 1981. Gulf did not acknowledge committing any violations, but agreed to pay approximately $140 million to DOE, partly for distribution to parties injured by the alleged violations of the regulations. *Gulf Oil Corp.*, 16 DOE (CCH) ¶ 85,381 at 88,-735 (1986). OHA then instituted special refund proceedings pursuant to the PODRA and its own procedural regulations, 10 C.F.R. pt. 205, subpt. V (1992), to distribute those funds.

■ Pursuant to PODRA, OHA requires that all applicants for restitution demonstrate that they were customers of the firm in question and that they were injured by the violations allegedly committed by that firm. Because the firms, like Gulf, that agree to consent orders normally do not admit any wrong-doing and are not parties to the distribution proceedings, OHA does not determine whether any alleged violation actually occurred. Instead, a claimant need only make a "reasonable demonstration that its claim is well founded." *Aztex Energy Co.*, 12 DOE (CCH) ¶ 85,116 at 88,359 n. 6 (1984); *see also Marathon Petroleum Co./Research Fuels, Inc.*, 19 DOE (CCH) ¶ 85,575 at 89,050 (1989) (requiring only a "reasonable demonstration of an allocation violation"), *aff'd, Research Fuels Inc. v. Dep't of Energy*, 977 F.2d 601 (Temp.Emer.Ct.App.1992).

## I. The Gulf Operations

In 1971, prior to the promulgation of federal regulations, Gulf had three classes of purchasers: (1) branded resellers; (2) branded retailers; and (3) industrial-commercial ("I–C") users. Gulf maintained a marketing and sales department for branded resellers and retailers that was separate from that which marketed to Gulf's I–C customers. On November 15, 1971, an I–C group salesman contracted for Gulf to sell Siegel 3,000,000 gallons of gasoline over the next twelve months. Thus, Siegel was classified in Gulf's pre-regulation I–C customer group, apparently because it was unbranded rather than because it was not a reseller. Siegel obtained its gasoline supplies from Gulf's Denver Terminal using the name "Lori Don Trucking." By October 1972, Siegel had purchased a total of 2,651,650 gallons of gasoline from Gulf as an unbranded I–C purchaser. Siegel, based in Colorado, resold this gasoline to various customers in the sanitation, agriculture, and cargo freight industries in the Denver area.

In October of 1972 Gulf discontinued its wholesale and retail operations in Colorado and thirteen other states. Gulf sold virtually all of its Colorado assets to Acorn, one of its former "branded resellers." Gulf agreed to continue to supply gasoline to Acorn as an unbranded reseller, and Acorn agreed to serve as Gulf's substitute suppli-

er in Colorado for any former customers that Gulf designated.

Then in 1974, upon promulgation of the Price and Allocation regulations, Siegel requested that Gulf supply it with the same quantity of gasoline that it had purchased in the base period (the corresponding months of 1972). Further, Siegel requested that Gulf supply it as a reseller, just as it was supplying Acorn. Gulf refused to supply Siegel directly, treating it still as an I–C end-user rather than a reseller. Gulf designated Acorn to complete its contract with Siegel, under the substitute supplier regulation. Acorn supplied the gasoline to Siegel, but at a higher price than Gulf was charging to its resellers. Siegel purchased gasoline from Acorn, but under protest.

Siegel immediately filed a written complaint with the Federal Energy Office ("FEO"), the precursor to DOE. On July 16, 1975, representatives of Siegel and Gulf met to discuss their differences. Siegel asserted that it had always been an unbranded reseller and thus it was improper for Gulf to classify it under the regulations as an end-user. Siegel demanded that Gulf supply it directly and charge Siegel the same reseller price it charged Acorn, as well as compensating Siegel for overcharges. Gulf refused. Between March 1974 and January 1981, the period covered by the regulation, Siegel purchased under protest a total of 16,383,008 gallons of Gulf gasoline through Acorn at retail prices.

In June of 1977, three years later, DOE responded to Siegel's complaint, concluding that Gulf had not violated the allocation regulation and recommending no further enforcement action against Gulf in the matter. That decision was affirmed in 1978 in an administrative appeal. Siegel then sued Gulf in federal court in Colorado. After trial in 1983, some five years later, the court dismissed Siegel's private cause of action on the grounds that the two-year Colorado statute of limitations applied and the cause of action had accrued in 1974. Thus, the court found that the limitations period expired while the DOE was deliberating on Siegel's FEO complaint. *See Siegel Oil Co. v. Gulf Oil Corp.*, 556 F.Supp. 302 (D.Colo.1982), *aff'd*, 701 F.2d 149 (Temp.Emer.Ct.App.1983).

## II. DOE Proceedings

In the early 1980's, DOE launched an independent investigation of Gulf for suspected violations of the allocation and pricing regulations. In June of 1985, Gulf and DOE settled the claims under investigation with a consent order. Pursuant to the EPAA, DOE collected $146,550,226.79 from Gulf for a "consent order fund," of which $42,499,566 was set aside for refunds to firms claiming to have been harmed by Gulf's violations of the petroleum regulations during the consent order period between January 1, 1973 and January 27, 1981. *See Gulf Oil*, 16 DOE at 88,735–36. OHA established procedures pursuant to PODRA for administering the consent order fund to compensate firms harmed by Gulf's actual or apparent allocation and price violations.

With respect to price violations, the DOE Implementation Order described three alternative bases for refunds to be claimed by resellers, retailers, and refiners, each involving a different presumption in favor of the claimant. The Order established an average measure of excess cost equal to $0.0064 per gallon. Purchasers who elected to limit their refund to a small claim, of no more than $5,000, could take advantage of a presumption that they suffered a pricing injury as a result of Gulf's conduct. *See id.* at 88,740. Such claimants were not required to submit any evidence of injury beyond establishing the volume of Gulf gasoline purchased. *See id.* The refund amount was determined by simply multiplying the volumetric excess cost amount by the volume of Gulf gasoline a claimant had purchased from Gulf during the consent order period. *See id.* Purchasers who sought a mid-range recovery of between $5,000 and $50,000 also could take advantage of the presumption that they suffered a pricing injury, provided they accepted as a refund 40

percent of the allocable volumetric share. *See id.* at 88,739–40. Purchasers who applied for refunds exceeding $50,000 had to demonstrate actual competitive injury. Under the terms of the Implementation Order, evidence of injury could be provided by "cost banks" showing unrecovered costs and other measures (such as gross margins, market conditions, or prices of competitors) that would tend to indicated that increased costs could not be passed through to customers. *See id.* As to the allocation regulations, claimants did not bear the burden of proving an actual violation of the regulation by Gulf, but only a "reasonable demonstration that [their] claim is well-founded," which is "less stringent than the level of proof required to demonstrate an actual violation of the DOE regulations." *Aztex Energy,* 12 DOE at 88,359 n. 6.

In 1988, Siegel applied to OHA for restitution from the Gulf consent order fund, alleging both price and allocation violations by Gulf. Siegel sought a refund totaling $548,981.93. Siegel alleged damages from the excessive price charged and from the fact that it could not purchase its entire allocation because of the higher price and therefore could not buy and resell its full allocation. With respect to the price claim, Siegel pleaded in the alternative all three methods of establishing a price claim.

On April 7, 1994, about six years later, OHA issued its decision and order awarding Siegel only the $5,000 small-claims refund.[1] OHA rejected Siegel's claim on three separate grounds. First, because Gulf had sold its assets to Acorn and had withdrawn from the Colorado market prior to the imposition of price and allocation controls in 1974, OHA ruled that the allocation regulations expressly permitted Gulf to substitute Acorn as Siegel's "base period supplier." *Gulf/Siegel,* 24 DOE at 88,045–46. Second, OHA found that Gulf had placed Siegel in the proper class of

purchaser with all the other former "I–C accounts." *Id.* at 88,048. Finally, OHA concluded that even if Gulf's actions had constituted a violation of either the allocation or pricing regulations, Siegel would not be entitled to a refund because it had not demonstrated any "injury" because it could not show that it had absorbed the higher costs of purchasing from Acorn rather than passing those costs through, in the form of higher prices, to its own retail customers. *Id.* at 88,050.

Siegal sought review of the OHA's final order in the United States District Court for the District of Columbia on July 11, 1994. On March 25, 1999, nearly five years later, the district court issued a Memorandum and Order denying Siegel's motion for summary judgment and granting the defendant's cross-motion for summary judgment, holding that the OHA decision "provides a rational basis for concluding that Siegel neither reasonably demonstrated a regulatory violation nor provided a persuasive equitable argument to qualify for its requested relief." *Siegel Oil Co. v. O'Leary,* C.A. No. 94–1498(WBB) (D.D.C. Mar. 25, 1999).

Siegel timely appealed to this court. We have jurisdiction under 28 U.S.C. § 1295(a)(11), (12) (1994). The appeal was submitted following oral argument on March 9, 2000.

## DISCUSSION

Siegel argues on appeal that the OHA's decision was neither rational nor supported by substantial evidence. Siegel argues that it presented a well-founded claim that Gulf violated the allocation rules by refusing to supply gasoline directly to Siegel, as a reseller. In addition, Siegel argues that the OHA erred in denying its price regulation claim because, it asserts, Gulf violated the pricing regulations by placing Siegel in an improper

---

1. Under the Gulf Implementation Order, Siegel's injury was considered a medium range claim, and thus entitled it to a 40% presumption. Because the $5,000 minimum presumption was higher than 40% of Siegel's $10,485 volumetric share, it was the largest presumptive refund Siegel could receive. *See Gulf/Siegel,* 24 DOE (CCH) ¶ 85,019 at 88,050 (1994).

class of purchaser. Finally, Siegel claims that its proof of injury was sufficient because it had provided a sworn affidavit that it maintained cost banks at the time and detailed tabulations of unabsorbed overcharges and the market conditions showing that it could not pass those overcharges through to customers.[2] The government argues that the OHA ruling was correct, because Siegel did not make an adequate showing of regulatory violation by Gulf, since the allocation regulations specifically provided for a substitute supplier. In addition, the government argues that the OHA correctly concluded that there was no pricing violation because, in accordance with past practice, Gulf properly classified Siegel as an end-user rather than a reseller. Finally, the government argues that Siegel was not entitled to a refund because, even assuming it could make an adequate allegation of regulatory violations, it had not submitted actual and verifiable "cost bank" information as required by the OHA Gulf Implementation Order to prove that it had not passed on the additional costs.

## I. Standard of Review

■ This court has adopted the precedent of the Temporary Emergency Court of Appeals and it reviews a district court's summary judgment disposition of a refund appeal *de novo*. *See Goodyear Tire & Rubber Co. v. Department of Energy*, 118 F.3d 1531, 1536 (Fed.Cir.1997). Nevertheless, this court gives great deference to the underlying agency action. We

> will set aside an EPAA/ESA agency action only if it is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence. We recognize DOE's administrative expertise, accord the agency's determinations great deference, and must approve the DOE decision if there is a rational basis for it.

2. Before the district court and the OHA, Siegel made an equitable claim that it should have received a hardship exception to the substitute supplier rule. The OHA determined that Siegel was profitable throughout

*Phoenix Petroleum Co. v. Federal Energy Regulatory Comm'n*, 95 F.3d 1555, 1567 (Fed.Cir.1996). Thus, we review the OHA decision, in light of Siegel's lesser burden of proof, for a "rational basis" and to determine if its findings were supported by substantial evidence.

## II. Allocation Claims

■ Siegel argues that Gulf failed to supply it with the same volume of gasoline as it had in the 1972 base period because Gulf improperly substituted Acorn as its base period supplier. Gulf did not have a valid economic reason for the substitution, Siegel argues, nor did it have a legitimate business reason for treating Siegel differently from Acorn. Thus, Siegel asserts that the OHA erred in concluding that it had not made a colorable claim that Gulf violated the allocation regulations when it substituted Acorn as Siegel's supplier. We do not agree.

The regulations explicitly contemplated and authorized substitution of suppliers "in accordance with normal business practices." 10 C.F.R. § 211 (1981). The ability to substitute suppliers was necessary to protect suppliers that altered their distribution patterns for legitimate business reasons. In *Whitco Inc.*, 2 FEA (CCH) ¶ 83,170 (1975), DOE's predecessor agency stated that the purpose of the substitute supplier rule was to promote the EPAA goals of "economic efficiency" and "minimization of economic distortion, inflexibility and unnecessary interference with market mechanisms." *Id.* at 83,552–53. Thus, OHA determined in *Whitco* that a firm's behavior was "in accordance with normal business practices" if it was based on "valid economic reasons." *Id.* at 83,553. Alteration of the nature of a firm's marketing and distribution system after the base period was found to be a valid economic

the period in question and did not suffer a decline in sales warranting equitable relief. The district court affirmed that OHA decision. Siegel does not put forth its equitable arguments before this court.

reason for designating a substitute supplier. *See id.*

In determining that Gulf's withdrawal from Colorado and other states was a valid economic reason for the supplier substitution, the OHA relied on a previous determination involving Gulf in *Mid–Michigan Truck Serv., Inc.,* 3 FEA (CCH) ¶ 83,100 (1976). In *Mid–Michigan,* the agency found that Gulf's decision to dispose of its inefficient marketing and distribution systems in Colorado and other states was a valid economic decision and thus a normal business practice. *See id.* at 83,360.

In addition, OHA relied on the record evidence that all of Gulf's I–C purchasers in Denver had their accounts terminated. when Gulf withdrew from the Colorado market in 1972. Thus, OHA found that Siegel's arguments that Gulf should have supplied Siegel just as it did Acorn rather than designating Acorn as a substitute supplier were not well grounded. The facts demonstrate that Siegel was treated no differently than any other former I–C purchaser in having Acorn designated as Gulf's substitute supplier.

Thus, we hold that there is more than substantial evidence to support the OHA finding that Gulf engaged in normal business practices both in designating Acorn as a substitute supplier for its Denver area I–C accounts and for Gulf's decision to treat Siegel identically to all other former I–C purchasers, based on its pre-regulation practice. Accordingly, we affirm the district court's decision upholding the OHA determination that Siegel did not make out a colorable, non-spurious claim of an allocation regulation violation.

### III. Price Claims

■ Siegel also asserts that it was overcharged for the gasoline purchased during the consent order period, because Gulf placed Siegel in an improper class of purchaser in violation of federal petroleum price regulations. Siegel argues Gulf should have moved it into the "unbranded reseller" class of purchasers in 1974 when Gulf transferred the members of its brand-ed reseller class into its newly-formed unbranded reseller class. Siegel argues that the OHA did not have substantial evidence or a rational basis for concluding that Siegel was placed in the proper purchaser classification by Gulf. We disagree.

In support of its argument, Siegel cites evidence that it was a "wholesale purchaser-reseller" rather than an end-user of Gulf gasoline during the 1972 base period. Siegel points to evidence that it purchased gasoline from Gulf for "various accounts in the sanitation, agriculture, and cargo freight and rail industries," and that it purchased gasoline in volumes comparable to Acorn during that period. In addition, Siegel alleged that Gulf admitted in the civil trial that Siegel was a "jobber" and that the court in that case found Siegel to be a base period "reseller." *See Siegel Oil Co. v. Gulf Oil Corp.,* 701 F.2d 149, 150 (Temp.Emer.Ct.App.1983) ("Throughout 1971 and the first ten months of 1972, Gulf, a refiner and supplier of petroleum products, sold gasoline to Siegel, an *unbranded, independent reseller* of refined petroleum products." (emphasis added)). Similarly, Siegel argues that the OHA itself made a determination that Siegel was a reseller when it awarded Siegel the minimal $5,000 presumptive injury refund for the price claim. Finally, as further evidence that it was a reseller, Siegel cites the fact that it took delivery of the gasoline during the 1974–81 period from the same Gulf pipeline terminal as Acorn and that like Acorn, it actually resold the gasoline.

The OHA, however, relied on 10 C.F.R. § 210.62(a), which required suppliers to continue to deal with purchasers

> according to *normal business practices in effect during the base period* specified in Part 211 for that allocated product, and no supplier may modify any normal business practice so as to result in the circumvention of any provision of this chapter.

(emphasis added). Thus, despite Siegel's apparent similarity to Acorn in 1974, noth-

ing in the regulations required Gulf to put Siegel in a different purchaser group than the one to which it was assigned in 1972. As Gulf had no class of *unbranded* resellers in 1972, OHA reasoned the I–C category was the proper category for Siegel during the base period, and the regulations actually required Gulf to continue its base period practices during the control period.

In addition, Siegel's argument that the Temporary Emergency Court of Appeals and the OHA determined that it was a reseller is without merit. As to the small claims award, Siegel's award of the $5,000 small claims amount under the Gulf Implementation Order does not require a classification as a reseller, but merely a classification as a refiner, reseller, or retailer. *See Gulf Oil,* 16 DOE at 88,740. The Temporary Emergency Court of Appeals' finding that Siegel was a reseller is not binding on the OHA, the D.C. district court, or this court in this litigation, particularly in light of the fact that the suit was dismissed as untimely. Thus, we agree with the district court's conclusion that "OHA had a rational basis for concluding that Siegel's 'only possible avenue for purchasing Gulf product was an I–C account,'" and we affirm the district court's decision to uphold the OHA price determination.

## IV. Proof of Injury

■ Finally, Siegel argues that the OHA erred in finding, in the alternative, that Siegel failed to carry out its burden of proving an injury. Siegel points out that it only bears the burden of making a well-founded claim of injury, not of proving the actual injury. Siegel argues that the sworn affidavit of its treasurer as to the lost profits was sufficient proof under the terms of the Implementation Order, which specified:

> a claimant will be required to demonstrate that it maintained a bank of unrecovered product costs. In addition, the claimant must show, through market conditions or otherwise, that it did not pass through those increased costs to its consumers. Such a showing might be

made through a demonstration of competitive disadvantage, lowered profit margin, decreased market share, or depressed sales volume during the period of purchases from the consent order firm.

Siegel asserts that prior cases establish that it should not have been required to provide actual documentary cost banks from the 1974–81 period, given that those records were unavailable because they were compiled so long ago. The OHA found that Siegel's affidavit was self-serving in light of its inability to produce the calculations and was insufficient to show injury. We must agree, although for a slightly different reason.

Siegal's affidavit merely states:

> During the consent order period, Siegel purchased Gulf products which, during many months, was [sic] priced uncompetitively for Siegel's market. Because of Gulf's uncompetitive prices, Siegel was unable to charge its maximum lawful selling price. Consequently, Siegel accumulated approximately $150,000 in unrecoved increased product costs through the end of the consent order period.

Siegel Aff. ¶ 3. In addition, Siegel points to statements in its 1978 DOE complaint and the complaint filed with the district court in its civil suit against Gulf as supporting its assertion that it could not pass the increased costs on to customers. All three of these documents contain essentially the same conclusory statement by Siegel that it was unable to charge its customers the higher price and thus incurred $150,000 in damages. Finally, Siegel points to invoices of sales between Gulf and Acorn and between Acorn and Siegel to support its injury claim. These invoices, however, contain no information about whether or not Siegel was able to pass the price increases on to its customers such as a demonstration of "lowered profit margin, decreased market share, or depressed sales volume." Siegel provided no documentation or calculations to support the asser-

tion that it could not pass the alleged higher prices on to its customers.

Once again, we are obligated to examine the decision of the OHA for a rational basis, giving great deference to the agency's expertise. Aside from the affidavit and the other equally unsupported and conclusory statements of injury, Siegel has offered no evidence that it was unable to pass the alleged increased costs on to its customer. The conclusory nature of the affidavit and the other evidence is more than sufficient to support the OHA's finding that Siegel had not provided adequate proof of injury to qualify for more than the presumptive volumetric injury award.

We do not accept, however, OHA's ground of decision that the affidavit was "self-serving." Of course, a company official's affidavit is self-serving in that it alleges injury in a manner that purports to be sufficient. But OHA had no basis to disbelieve the affiant, i.e., no ground to think he was fabricating his assertions. Rather, his affidavit lacked factual and quantitative support and was devoid of references to supporting documentation. Thus, we do not accept the premise that any "self-serving" evidence must be rejected. Rather, we hold that a purchaser seeking a refund must submit more than merely conclusory statements of injury without any support or information about how the injury was calculated.

## CONCLUSION

The district court prepared a clear and concise opinion addressing the issues in this case. It did not err in concluding that OHA's determination that there was no allocation violation was supported by substantial evidence and had a rational basis because Gulf's decision to substitute Acorn as Siegel's supplier was in accordance with normal business practices. Likewise, the district court did not err in concluding that OHA properly determined that there was no price violation because Gulf charged Siegel the price determined by its pre-regulation classification. Finally, the district court did not err in determining that Siegel did not provide adequate proof of an injury to qualify for more than the presumptive injury award. Therefore, the decision of the district court is

### *AFFIRMED*.