**LITTLETON GAS COMPANY,**
Plaintiff,

v.

**UNITED STATES DEPARTMENT OF ENERGY, Defendant.**

**No. CIV.A. 01–0342(RMC).**

United States District Court,
District of Columbia.

Dec. 29, 2003.

22

William Herbert Bode, Bode & Grenier, L.L.P., Washington, DC, for Plaintiff.

Don W. Crockett, U.S. Department of Energy, Washington, DC, for Defendant.

## MEMORANDUM OPINION

COLLYER, District Judge.

Littleton Gas Company ("Littleton") appeals a December 7, 2000, Decision and Order ("D & O") of the United States Department of Energy's ("DOE") Office of Hearings and Appeals ("OHA"). OHA denied Littleton's application for a full "volumetric" refund of overcharges paid to Vessels Gas Processing Company ("Vessels") during the period of price controls on petroleum products in the 1970s. Littleton and DOE have filed cross motions for summary judgment. Having carefully considered the parties' briefs and the certified administrative record, the Court finds that OHA erred as a matter of law when it rejected Littleton's application and supporting materials. Accordingly, the case is remanded to OHA for calculation of a full "volumetric" refund, with interest, on Littleton's application, except to the extent OHA determines that Littleton voluntarily reduced its profit margins.

## I. BACKGROUND

### A. Restitution Program

In the early 1970s, the Organization of Petroleum Exporting Countries imposed an oil embargo on the United States, which led to an energy crisis in this country. Congress responded by passing the Emergency Petroleum Allocation Act of 1973 ("EPAA"), 15 U.S.C. § 751 *et seq.*, to regulate the allocation and prices of petroleum products. Under that statute, DOE and its predecessors, the Federal Energy Administration and the Federal Energy Office ("FEO"), issued price control orders governing the sale and resale of natural gas liquids ("NGLs") and natural gas liquid products ("NGLPs"). *See* Mandatory Petroleum Price Regulations, 10 C.F.R. Part 212. DOE was also empowered to seek restitution for violations of the price control regulations, which remained in effect until January 1981.[1] Executive Order No. 12287, 46 Fed.Reg. 9909 (1981).

---

1. EPAA incorporated section 209 of the Economic Stabilization Act of 1970 ("ESA"), 12 U.S.C. § 1904 note.

DOE's authority to prosecute violations and to collect monies for restitution to affected customers was subsequently repealed, barring actions commenced after September 30, 1988, or six years after an illegal overcharge, whichever was later. 15 U.S.C. § 4504(a)(1).

In 1979, DOE promulgated the "Subpart V" regulations for the distribution of funds collected from companies by DOE under both ESA and EPAA. 10 C.F.R. § 205.80–88 (1988). In 1986, Congress enacted the Petroleum Overcharge [Distribution] and Restitution Act (PODRA), 15 U.S.C. § 4501–4507 (1988), to distribute funds "in accordance with subpart V regulations." 15 U.S.C. § 4502(b)(1)(A)-(C).

*Sinclair Oil Corp. v. Abraham,* 291 F.3d 822, 824 (Fed.Cir.2002). PODRA directs OHA to establish the amount of injury incurred by any persons due to an "actual or alleged violation of the petroleum pricing and allocation regulations" and to make direct restitution to those persons. 15 U.S.C. § 4502(b). Remaining funds are to be distributed among various States and the federal government as indirect restitution for the ultimate consumers who presumably bore the largest part of the overcharges. *Id.* § 4503; *see also Van Vranken v. DOE,* 882 F.2d 514, 517–18 (Emer.Ct.App.1989).

Pursuant to these authorities, DOE investigated and eventually entered into a Consent Order with Vessels whereby Vessels paid $1,564,222.74 to DOE as restitution for overcharges on NGLs and NGLPs during the period of September 1, 1973, to December 31, 1977. Vessels made its final payment to DOE on October 12, 1994.

Thereafter, DOE commenced a special refund proceeding to distribute those funds to parties deemed to have been injured by the overcharges.

The Notice of Implementation of Special Refund Procedures for Vessels established that eligible claimants would be entitled to a refund derived by multiplying the purchase volume on which overcharges were paid by a "volumetric" factor. 61 Fed. Reg. 652, 653 (Jan. 9, 1996). To determine this factor, OHA divided the total amount of Vessels's payments to DOE by the approximate number of gallons Vessels sold during the applicable period.[2] As relevant here, the "volumetric" factor was calculated to be $0.0261.[3]

Under DOE's special refund process, a claimant initially must show that it purchased NGLs or NGLPs from Vessels during the period in which overcharges occurred. Recognizing that firms such as Littleton purchased Vessels's product for resale, and that such firms might have had an opportunity to pass some or all of the overcharges on to their customers, OHA requires resellers seeking a full "volumetric" refund also to submit "actual proof of injury." C.A.R. at 169.

For example, [a reseller] could show that competitive market forces forced it to absorb those price increases .... To calculate the maximum allowable price that a reseller could charge for a product during a month [when the price controls were in effect], the reseller added (1) the per gallon purchase price, (2) any previously unrecovered (per gallon) product costs and (3) the per gallon margin of profit for May 15, 1973 .... If

---

**2.** "The volumetric refund presumption assumes that the alleged overcharges by a firm were dispersed equally over all gallons of product marketed by that firm." 61 Fed.Reg. 652, 653 (Jan. 9, 1996).

**3.** "On August 13, 1997, the DOE issued a Supplemental Decision and Order increasing the per gallon volumetric factor for the Vessels refund proceeding from $0.0185 to $0.0261." C.A.R. at 171 n. 8.

the marketplace permitted a firm to re-alize its maximum prices and thus pass on any cost increases, including over-charges, then no injury occurred in that month and no refund would be in order. *Id.* at 170.

. In addition, the reseller will be required to show that it had a "bank" of unrecov-ered costs in order to demonstrate that it did not recover the increased costs associated with the alleged overcharges by increasing its own prices. The main-tenance of a bank does not, however, automatically establish injury.

61 Fed.Reg. at 654.

Because the period for which refunds are requested—September 1, 1973, to De-cember 31, 1977—is "relatively remote in time, . . . [OHA has] allowed firms that are attempting a full showing of injury to ap-proximate" the data. C.A.R. at 171. Ac-ceptable materials include purchase and sales receipts, reliable market price data for an applicant's area of operations and type of customer, documentation of a firm's margin of profit as of May 15, 1973, sales tax documentation, and reconstruc-tions of selling prices and margins of profit "based upon contemporaneous documenta-tion of their product cost, and volume of purchases and sales for that month. How-ever, all of these methodologies require the applicant to furnish some type of reli-able, factual documentation." *Id.*

In lieu of making a detailed showing of injury . . . a reseller claimant whose al-locable share exceeds $10,000 may elect to receive a refund under the medium-range presumption of injury. Under this presumption, a claimant will receive as its refund the larger of $10,000 or 60 percent of its allocable share up to $50,000.

61 Fed.Reg. at 653–54.

## B. Littleton's Refund Application

Prior to its dissolution on February 29, 1984, Littleton was engaged in the resale of propane to residences throughout Colo-rado.[4] Littleton purchased 9,276,376 gal-lons of NGLs and NGLPs from Vessels during the period of September 1, 1973, to December 31, 1977. On April 8, 1996, Littleton filed an application with OHA for a full "volumetric" refund of overcharges paid to Vessels, ultimately seeking $242,113, plus interest.[5] Littleton supple-mented this filing on November 7, 1996, with its "[cost] bank of unrecouped in-creased costs for NGLPs, calculated on a monthly basis for the covered period[,]" and a competitive disadvantage analysis.[6] C.A.R. at 7.

On April 8, 1997, OHA sent Littleton a letter asking for its Employer Identifica-tion Number. From April through No-vember 1997, the parties corresponded about ownership interests in Littleton based on OHA's suspicion that "Littleton was once affiliated with Vessels, contrary to a statement made in the Littleton re-fund application." *Id.* at 21. OHA asked Littleton for a list of its owners and wheth-er Littleton was a trade name used by LPG Energy Corporation. Littleton pro-vided OHA with a description of its owner-

---

4. This lawsuit is being brought on behalf of the living shareholders of the former compa-ny.

5. In its first supplemental submission to OHA, Littleton made a claim for only $171,613, plus interest, based on the old "volumetric" factor of $0.0185 per gallon.

6. The cost bank compared Littleton's weight-ed average per gallon margin with its permis-sible margin from May 15, 1973. The com-petitive disadvantage analysis set forth the differences between the weighted average prices Littleton paid Vessels for NGLPs and market prices.

ship shares and explained that "Littleton Gas was never a trade name for LPG Energy Corp." *Id.* at 22, 28. Littleton also submitted signed authorizations from its shareholders endorsing Littleton's refund application. Then there was silence from OHA.

On June 28, 1999, Senator Ben Nighthorse Campbell of Colorado wrote to OHA concerning the Littleton application. Thus prompted to work on the application, OHA sent a letter to Littleton one month later requesting additional information "concerning the operation and ownership of [the] firm[ ] during the consent order period and at the time of corporate dissolution." *Id.* at 45. OHA also sought information on Littleton's customer base, product market, and propane sales, the percentage of Littleton's propane requirements obtained from Vessels, and why OHA should rely on the *Monthly Petroleum Product Price Reports* ("*MPPPR*") for pricing data rather than *Platt's Oil Price Handbook and Oilmanac* ("*Platt's*"). George B. Breznay, Director of OHA, then responded to Senator Campbell explaining that OHA had recently requested additional information from Littleton and that, "[o]nce that information is received, [OHA] will be in a position to issue a determination promptly." *Id.* at 47. A letter from Senator Wayne Allard's office dated August 20, 1999, was answered with the same response by Mr. Breznay on September 20, 1999.

Littleton submitted the additional information to OHA on September 24 and 30, 1999. Littleton stated that, during the period of September 1, 1973, to December 31, 1977, it was almost exclusively a retail-er of petroleum products to small customers and institutional accounts throughout Colorado. The typical customer purchased in 500 to 1,000 gallon quantities. William Huston, former president of Littleton,[7] reported that NGLs purchased by Littleton from Vessels during the relevant period ranged from 10% to 80% of Littleton's total propane requirements. Littleton also filed a revised competitive disadvantage analysis, clarifying that it had in fact used pricing data from *Platt's* not *MPPPR.*

Follow-up inquiries from Senators Allard and Campbell were sent to OHA on November 12 and 24, 1999, and December 1, 1999. OHA, in turn, requested additional information "with respect to the merits of Littleton's claim of injury" from Littleton on December 8, 1999. Def. Cross Mot. at 4. In particular, OHA asked Littleton for a "detailed description of the method by which [Littleton] calculated its May 15, 1973, maximum allowable selling price and allowable margin." C.A.R. at 71.

Mr. Breznay responded to Senator Allard on January 6, 2000. Mr. Breznay was able to tell Senator Allard that "the Littleton Application is awaiting the submission of a very limited amount of additional information . . . ." *Id.* at 73. On January 14, 2000, Mr. Breznay also notified his staff that he had received a call from Congressman Scott McInnis's office[8] about OHA's "favorite case." *Id.* at 74. Mr. Breznay told the Congressman that more information was needed, upon receipt of which OHA would be able to "move briskly ahead with a final decision on the claim . . . ." *Id.*

By letter dated February 22, 2000, Littleton provided additional materials to

---

7. A later letter and declaration from Littleton refer to Mr. Huston as the company's former operations manager.

8. In his e-mail, Mr. Breznay referred to "Sen. McGinnis' office[.]" The Court assumes he actually meant Congressman Scott McInnis, who represents Colorado's 3rd Congressional District.

OHA, including a reconstructed cost bank for the period of September 1973 through January 1981—to show that Littleton did not recover increased costs after 1973 but before the end of propane price controls on January 27, 1981—and a declaration from Mr. Huston. Mr. Huston stated that Littleton "set its lawful margins by reference to its selling prices to residential customers on May 15, 1973, minus the cost of propane in inventory[,]" resulting in a profit margin of $0.0972 per gallon.[9] *Id.* at 84. In support, Mr. Huston attached a copy of a contract between LGAC and American Oil Company ("Amoco") that contained the following handwritten notations in column format: "7.38 [+] 9.72 spread [=] 17.10." Mr. Huston explained:

> Around November of 1973, prior to taking over for [Littleton], I met with Mr. [James] Mulhall [LGAC's owner and president] to set down on paper [the company's] position under the price regulations. [Mr. Mulhall] pencilled on the Amoco Sales Agreement the price of propane from Amoco at that time which was $.0650 per gallon. He added to that the cost of delivery to [LGAC] of $.0088 per gallon, for a total cost price of $.0738. He wrote down this cost of propane and then added to it [LGAC's] lawful margin of $.0972 per gallon, to arrive at a lawful selling price of $.1710 per gallon. I saved this document to show the FEA the basis for our prices if we were ever audited .... I am absolutely confident that the margin was $.0972 per gallon, because Mr. Mulhall was so angry about it at the time the price regulations went into effect.

*Id.* at 84–85.

OHA requested more evidence on March 24, 2000, based on its belief that Littleton's "responses lack the required documentation concerning maximum allowable selling price and allowable margin." *Id.* at 90. OHA apparently discounted Mr. Huston's declaration because it ended with the line, "This is my *best recollection* of events ...." *Id.* at 85 (emphasis added); *see also id.* at 90. Instead, OHA sought "contemporaneous documentation; accounting worksheets, reports to state authorities, or financial statements which might substantiate [Littleton's] claimed maximum allowable selling prices and allowable margins." *Id.* at 91. Littleton responded on April 18, 2000, and requested an evidentiary hearing, which Mr. Breznay eventually denied. Littleton advised OHA that the statement, "This is my best recollection of events[,]" is "phraseology that is used customarily in affidavits in legal proceedings" and does not mean that Mr. Huston's declaration was "the product of an uncertain memory." *Id.* at 92.

By letter dated May 3, 2000, from Senator Allard, letter dated May 8, 2000, from Senator Campbell, letter dated May 22, 2000, from Congressman McInnis, and letter dated June 6, 2000, from Senator Allard, Littleton's legislative representatives requested updates on OHA's slow handling of the application. Mr. Breznay responded to them on June 8 and 15, 2000, with similar letters. He again referenced an outstanding OHA information request to Littleton as the basis for the delay. He also advised, "The type of supporting information and the depth of corroboration necessary to substantiate [a claim of overcharges] will in some measure depend on the size of the refund that the applicant is seeking." *Id.* at 128. Mr. Breznay wrote to Senator Allard again on July 5, 2000, noting that OHA had sent a June 5, 2000,

---

**9.** In the fall of 1973, Littleton purchased Littleton Gas & Appliance Company ("LGAC"), where Mr. Huston was operations manager. Following the acquisition, Littleton "continued using the same lawful margins" that LGAC had used. C.A.R. at 84.

request for more information to Littleton "to give [it] one last opportunity to provide additional information regarding these claims." *Id.* at 133.

Littleton responded to OHA's June 5, 2000, letter with a supplemental submission on July 5, 2000. A second declaration from Mr. Huston reiterated that Littleton had a margin of $0.0972 per gallon on May 15, 1973, and attached ledgers of two competitors showing their sales prices of $0.1844 to $0.201 per gallon, above Littleton's purported $0.1710 price per gallon on May 15, 1973. Mr. Huston affirmed:

> I restate that my memory of these events is vivid because of the importance of this event in my life, and because Mr. Mulhall was so angry about the margins. Many of our residential propane customers, particularly in the outlying regions, were being charged in the low 20 cents per gallon range at that time. On May 15, 1973, however, Littleton Gas and Appliance made a few sales at relatively low prices. Mr. Mulhall thought that the Company's proper margin should have been about $.15 per gallon.

*Id.* at 141. In addition, Littleton submitted a copy of *Platt's* posting for propane in Group 120, showing that the low price for propane in 1973 was $0.0648, just below the price Littleton paid to Amoco of $0.0650 under the sales agreement that expired at the end of May 1973. *See id.* at 138, 150. Michael Barron, an attorney who has represented many firms in petroleum overcharge refund proceedings before OHA, also provided a declaration in support of Littleton's application, stating that the "May 15, 1973 margin of $.092 per gallon declared by Littleton Gas was very typical of the margins realized by propane retailers in western states such as Colora-

do." *Id.* at 152. Finally, Littleton referred OHA to an audit conducted by FEO in late 1974 or early 1975 in which auditor Helen Nelson allegedly certified that the company's margin was $0.0972 per gallon.[10]

Another round of inquiries from Capitol Hill then ensued. This correspondence sought a reason for OHA's assertion that Littleton's May 15, 1973, profit margin was "relatively high[,]" a point that Littleton vehemently denied. *See id.* at 136, 159–61. By letters in September 2000, Mr. Breznay informed Senator Campbell and Congressman McInnis that OHA had no "reports or studies regarding the May 15, 1973 margins of propane resellers. [OHA's] observation that Littleton's margin was 'relatively high' is based upon the experience of [Mr. Breznay's] staff which has reviewed a number of refund claims ...." *Id.* at 162, 163. Mr. Breznay added that "as long as an applicant can sufficiently prove what its May 15 margin was, the amount of the margin itself does not present a bar to receiving a full volumetric refund." *Id.* He told Senator Allard, "Some of my experienced staff may view a 9.2 cents per gallon margin as high for 1973, but I seriously doubt that the size of the margin in relation to competitors will prove at all relevant in our decision on the Littleton refund case. In any event, that kind of undocumented recollection will play no part in [OHA's] final decision." *Id.* at 164.

## C. OHA's Decision and Order

On December 7, 2000, OHA granted in part Littleton's refund application, instructing DOE's Director of Special Accounts and Payroll to disburse $89,202 ($50,000 in principal and $39,202 in interest) to Littleton. The D & O noted that

---

10. Littleton asserts that it is unable to obtain a copy of these audit records under the Freedom of Information Act, 5 U.S.C. § 552, because they are enforcement documents. *See* C.A.R. at 139.

Littleton's request for a full "volumetric" refund of $242,113, plus interest, was "a substantial refund and, of course, must be supported by a full demonstration of injury." C.A.R. at 172. Commenting that Littleton had reconstructed its cost banks without contemporaneous records, and "in view of the magnitude of the potential refund, [OHA had] asked Littleton to provide factual support, such as documentary material establishing the firm's May 15, 1973 selling prices and margin of profit." *Id.* at 172.

OHA acknowledged Mr. Huston's declarations concerning Littleton's claimed May 15, 1973, margin of $0.0972, but stated

[OHA's] sense of the matter was that in 1973, a 132 percent per gallon margin of profit for a wholesale purchaser/reseller of NGLs and NGLPs located anywhere in the nation would have been high . . . . [OHA's] recollections of propane price and margin data from 27 years in the past is neither more nor less reliable than that of the Littleton affiant.

*Id.* at 173–74. At its critical juncture, OHA found

any number of difficulties with the affidavit and the notation on the Amoco contract: there is no indication as to when the notation was written, by whom or for what purpose. The notation could refer only to purchases from Amoco, not Vessels. Regardless, *the whole matter rests on the undocumented recollections of Mr. Huston that are memorialized in the affidavit.* The problem with relying upon affidavits is that memories fade. For example, in this case, in his first sworn declaration—the February 18, 2000, letter—Mr. Huston clearly remembers meeting with Mr. Mulhall and Mr. Mulhall writing the Littleton May

15, 1973 margin on the Amoco contract—"around" November of 1973. In contrast, in his July 3, 2000 affidavit, Mr. Huston swears that Mr. Mulhall wrote the margin data on the Amoco contract specifically on December 3, 1973. *That, in a nutshell, exemplifies the difficulty with undocumented recollections.*

*Id.* at 174 (emphasis added). Emphasizing this point, OHA concluded

Mr. Huston's letter of February 18, 2000, and his affidavit are inconsistent on their face and unsupported by any factual material. As a result, we reject the Houston [*sic* ] affidavit and Littleton's claim of a May 15, 1973, profit margin of 9.72 cents per gallon. Accordingly, we also reject the firm's reconstructed cost banks and showing of injury which depend upon the asserted May 15, 1973 margin, and will deny the Littleton application for a full volumetric refund.

*Id.* OHA also refused to credit Littleton's report that it had been subject to an FEA audit by Ms. Nelson, after which Ms. Nelson had allegedly approved Littleton's profit margin. OHA asserts that it "searched diligently for any records of such an audit and believe[s] that if they ever existed, they have been destroyed." *Id.* at 173 n. 11.

As a result, OHA utilized the medium-range presumption of injury contained in the Notice of Implementation of Special Refund Procedures for Vessels to award Littleton $50,000, plus interest, based on its finding that Littleton had purchased 9,276,376 gallons of propane from Vessels during the period of September 1, 1973, to December 31, 1977.[11] *Id.* at 175.

---

11. OHA noted that information in the Vessels audit and case files "suggest[ ] that Littleton's purchase volume claim is reasonable." *Id.*

## II. ANALYSIS

The purpose of a Subpart V proceeding is to distribute "refunds to injured persons in order to remedy the effects of a violation of the regulations of [DOE]." 10 C.F.R. § 205.280; *see also* Def. Cross Mot. at 2. To that end, a claimant "need only make a 'reasonable demonstration that its claim is well founded.'" *Siegel Oil Co. v. Richardson*, 208 F.3d 1366, 1368 (Fed.Cir. 2000) (quoting *Aztex Energy Co.*, 12 DOE (CCH) ¶ 85,116 at 88,359 n. 6 (1984)); *see also* Def. Cross Mot. at 12. A court reviews an "OHA decision, in light of [a claimant's] lesser burden of proof, for a 'rational basis' and to determine if its findings were supported by substantial evidence." *Siegel Oil Co.*, 208 F.3d at 1371.

The primary issue underlying this appeal is whether Littleton's profit margin on May 15, 1973, was $0.0972 per gallon, as claimed by Littleton.[12] *See* Def. Cross Mot. at 11. This figure is critical to calculating the extent of injury from Vessels's illegal overcharges. A reseller's allowable margin, combined with its purchase price (including overcharges and previously unrecovered product costs), established its maximum lawful selling price during the period in which price controls were in place.[13] A reseller able to meet its maximum lawful selling price would be considered *per se* unharmed because—by law—it could not have recorded a higher profit, regardless of the overcharges. In such a situation, the reseller presumably would have passed on the overcharges to the consumer. *See* C.A.R. at 170. Conversely, a reseller that could not realize its maximum lawful selling price would have sustained some injury, generally the difference between its May 15, 1973, profit margin and its actual (lower) margins during the period of September 1, 1973, to December 31, 1977.[14]

OHA declined to award Littleton a full "volumetric" refund based essentially on the agency's rejection of Mr. Huston's two declarations, which asserted that Littleton's allowable profit margin was $0.0972. DOE argues in its brief that "the corroborating evidence itself is either wholly undocumented hearsay (the former owner's undocumented notation of the margin and the Barron declaration) or without probative value (prices charged by other suppliers on May 15, 1973)." Def. Cross Mot. at 13–14 (footnote omitted). Thus, according to DOE, "Littleton simply failed to submit documentation or other evidence sufficient to carry its burden of establishing its own May 15, 1973 prices, costs, and margins." *Id.* at 14.

---

12. OHA, itself, identified Littleton as a potential victim of overcharging by Vessel in its investigation of Vessels that led to the Consent Order. C.A.R. at 168 n. 2. OHA even accepted Littleton's reconstruction of its volumetric purchases from Vessel. *Id.* at 175 n. 12. What OHA rejected was Littleton's evidence of a $0.0972 per gallon profit margin on May 15, 1973.

13. A reseller could not increase its profit margin during the relevant period. C.A.R. at 170 ("The maximum allowable per gallon selling price operated to limit a seller to its May 15, 1973 per gallon [profit] margin for a given product and class of purchaser. Thus, the May 15, 1973 margin is a historic benchmark for per gallon profitability for use during the price controls regime.").

14. As DOE notes in its D & O, "Some firms ... held their product prices down or reduced product prices for reasons other than competitive market forces. Such an action would artificially inflate a firm's banks of unrecovered costs, but would mean that the firm had elected to absorb the overcharges." C.A.R. at 170 n. 6. A reseller that strategically chose not to realize its May 15, 1973, profit margin would not have been injured by the overcharges, even though it did not achieve its maximum lawful selling price.

As an initial matter, it must be noted that OHA denied Littleton's request for an evidentiary hearing in this matter. OHA's credibility determination, consequently, did not rest on an adjudicator's evaluation of any witness's testimony, demeanor, consistency under cross examination, or any of the normal tools used by a trier of fact in deciding whom to believe. OHA had no more or less evidence before it than does this Court. Moreover, "agency expertise" hardly contributed to OHA's conclusions. OHA cited no studies, reports or analyses in the D & O supporting its belief that Littleton's purported profit margin seemed "high." C.A.R. at 174. Rather, OHA's decision rested on its "sense of the matter" as to profit margins "anywhere in the nation" in 1973, which it deemed "neither more nor less reliable than that of the Littleton affiant." [15] *Id.* at 173–74.

OHA discounted Mr. Huston's affidavits because, in its opinion, "memories fade." *Id.* at 174. As an example, OHA noted that Mr. Huston recalled in his first declaration that he met with Mr. Mulhall "around" November 1973, whereas his second declaration specifically stated that Mr. Mulhall wrote the margin data on the Amoco contract on December 3, 1973. From this, OHA concluded that "Mr. Huston's letter of February 18, 2000, and his affidavit are inconsistent on their face[,]" warranting complete disbelief. *Id.*

While it is true that Mr. Huston's two declarations are different, it is not accurate to say that they are "inconsistent" or that this alleged inconsistency was over a con-tested point or sufficiently germane to cause a trier of fact to discredit everything recounted by Mr. Huston. December 3rd is, in point of fact, "around" November; the two time references are not mutually exclusive. Importantly, the aim of Mr. Huston's statements was to show that Mr. Mulhall wrote the relevant figures from which the allowable profit margin was derived on the Amoco contract *immediately before Mr. Huston took over the business,* not on a particular date in that time frame. OHA gave no reason in the D & O to discredit the report of this meeting; the agency only questioned the meeting's exact date and referenced its generalized "sense" of nationwide propane profit margins to discredit the cost and margin reflected on the sales agreement. *See supra* at 31 n. 16.

OHA also rejected Mr. Huston's affidavits on the grounds that they lacked factual and quantitative corroboration. *See* Def. Cross Mot. at 16 ("Littleton has not submitted *any* admissible documentary evidence to substantiate its claim that it had a margin of 9.72¢ for its sales on May 15, 1973[.]") (emphasis added). However, Littleton presented substantial evidence as part of its refund application, including the two sworn declarations from Mr. Huston, just discussed; the Amoco contract with handwritten notations; a declaration from Mr. Barron as to general selling prices for propane dealers in Colorado during the relevant time period; a *Platt's* record of wholesale prices that resellers would have paid for propane for resale; and ledgers

15. Even without supporting documentation, Mr. Huston would clearly know more about the profit margins of this particular firm, against which a mere generalized "sense" of *national* pricing is all but irrelevant. In addition, Mr. Huston supported the internal credibility of his memory by tying it to specific reasons for his clear recollections: the profit margin of May 15, 1973, was crucial to the future success of the business he was taking over from Mr. Mulhall and Mr. Mulhall was angry that it was so low. Since Mr. Huston operated the business from 1973 to 1981 under this profit margin ceiling imposed by the price controls, his direct recollection—of which he is "absolutely confident[,]" *see id.* at 85—should be credited over OHA's "sense" of nationwide data.

from two local competitors as to their resale prices for propane in Colorado.[16]

In dismissing the handwritten notations on the sales agreement with Amoco, OHA stated that "there is no indication as to when the notation was written, by whom or for what purpose. The notation could refer only to purchases from Amoco, not Vessels." C.A.R. at 174. The when, who, and why of the notations are supplied by Mr. Huston's averments. More tellingly, OHA confused the subject matter of the notations, in an apparent failure of "agency expertise." The handwritten notations on the Amoco contract were submitted to demonstrate the applicable profit margin on May 15, 1973, not Littleton's later inflated purchase prices from Vessels. Further, it is irrelevant from whom LGAC purchased NGLs or NGLPs on May 15, 1973, only that the company's total cost for propane on that day was $0.0738 per gallon. According to Mr. Huston, LGAC had a contract with Amoco effective through May 31, 1973. The notations, therefore, would obviously "refer only to purchases from Amoco, not Vessels." *Id.; see also id.* at 85 ("Vessels Gas soon became our dominant supplier thereafter."). Why this factor was important enough to cause OHA to question the validity of the handwritten notations is unsubstantiated.

■ OHA's rejection of Littleton's declaration from Mr. Barron, an attorney who has represented over 100 propane/butane retailers and marketers in other petroleum overcharge refund proceedings, also was erroneous. Without elaboration, DOE contends that Mr. Barron's affidavit constituted "undocumented hearsay[.]" Def. Cross Mot. at 13. "It is well established[, however,] that hearsay evidence may be substantial evidence in an administrative proceeding if there are circumstances which give it credibility and probative value to a reasonable mind." *Sanders v. United States Postal Service,* 801 F.2d 1328, 1331 (Fed.Cir.1986). In addition, Mr. Barron was offered as an expert in the area, with extensive knowledge of the propane market in the western United States. *See* FED. R. EVID. 702. Expert testimony based on personal experience and opinion may be sufficient to prove a point as long as the expert possesses the specialized knowledge on which to base his opinion. OHA did not discredit Mr. Barron as an expert, which is not surprising since it has apparently accorded his opinions substantial weight on previous occasions. *See* Pl. Mot. for Summ. J. at 15–16. For this reason, OHA should not have rejected Mr. Barron's declaration unless the agency first found that Mr. Barron lacked the expertise he asserted.

In further support of its refund application, Littleton recounted an FEO audit in the mid–1970s in which Ms. Nelson allegedly confirmed the company's $0.0972 per gallon allowable profit margin. OHA admittedly cannot find any record of this audit, which occurred approximately 30 years ago. For some reason, OHA—without any basis for its comment—cast subtle aspersions on Littleton's recollection of the audit, as if it did not happen at all. *See* C.A.R. at 173 n. 11 ("We have searched diligently for any records of such an audit and *believe that if they ever existed,* they have been destroyed.") (emphasis added). Since OHA gave no grounds to dispute the truth of the audit report—other than the

---

**16.** OHA had repeatedly asked for internal company documentation of Littleton's May 15, 1973, profit margin in addition to Mr. Huston's sworn statements, but none was available because the business had dissolved on February 29, 1984, more than a decade before OHA issued the Notice of Implementation of Special Refund Procedures for Vessels on January 9, 1996.

fact that it could not find 30–year old documents from a defunct agency—and the record otherwise reveals no reason to doubt that the audit occurred as sworn to by Mr. Huston, the jaundiced comment is lacking in evidentiary support, much less substantial evidence. This was not a valid reason to refuse to credit Mr. Huston's declarations on this issue.

■ Littleton provided ample evidence to establish its May 15, 1973, profit margin at $0.0972 per gallon, and OHA offered no rational basis in the D & O for discounting these materials. The reconstructed cost bank shows that Littleton did not achieve this margin overall during the relevant time period, leading to an accumulation of $303,108.53 in increased costs by December 31, 1977. Given this potential loss, Littleton appears to be entitled to a full "volumetric" refund of $242,113, plus interest. Because Littleton admits "cutting back [its] margins to put [it] in a more competitive position[,]" however, its actual injury from the overcharges may turn out to be less than the amount of a full "volumetric" refund. *Id.* at 85; *see also id.* at 170 n. 6. Accordingly, the case is remanded to OHA for calculation of a full "volumetric" refund, plus interest, on Littleton's application, except to the extent OHA determines that Littleton strategically chose to lower its profit margins.

### III. CONCLUSION

For the reasons stated above, the Court grants in part Littleton's motion for summary judgment and denies DOE's cross motion for summary judgment. Littleton's application is remanded to OHA with instructions to award Littleton a full "volumetric" refund of $242,113, plus interest, except to the extent OHA determines that Littleton voluntarily reduced its profit margins during the relevant time period.

A separate order accompanies this memorandum opinion.

### ORDER

For the reasons stated in the memorandum opinion that accompanies this order, it is hereby

**ORDERED** that Plaintiff's motion for summary judgment is **GRANTED** in part. It is

**FURTHER ORDERED** that Defendant's cross motion for summary judgment is **DENIED**. It is

**FURTHER ORDERED** that Plaintiff's application is remanded to the Office of Hearings and Appeals ("OHA") for calculation of a full "volumetric" refund of $242,113, plus interest, except to the extent OHA determines that Plaintiff voluntarily reduced its profit margins during the period of September 1, 1973, to December 31, 1977.

**SO ORDERED.**